IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ISAAC C. BYNUM,

        Petitioner,

    v.

JEFF PREMO,

        Respondent.

Civil No. 6:15-cv-00311-AC

FINDINGS AND RECOMMENDATION

KURT DAVID HERMANSEN
Assistant Federal Public Defender
859 Willamette Street
Suite 200
Eugene, OR 97401

        Attorneys for Petitioner

ELLEN F. ROSENBLUM
Attorney General
NICHOLAS M. KALLSTROM
Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, OR 97301

        Attorneys for Respondent

ACOSTA, Magistrate Judge.

Petitioner, an inmate in the custody of the Oregon Department of Corrections, brings this habeas corpus action pursuant to 28 U.S.C. § 2254. For the reasons that follow, the Court should DENY the Amended Petition for Writ of Habeas Corpus (ECF No. 19).

## PROCEDURAL BACKGROUND

On August 7, 2003, a Washington County grand jury indicted Petitioner on one count of Murder by Abuse for the death of his two-year-old son RB. The case was tried to the court. At the conclusion of a lengthy trial, the trial judge found Petitioner guilty and imposed a life sentence with a 25-year mandatory minimum term of incarceration.

Petitioner filed a direct appeal, arguing that the trial court erred in denying a motion for judgment of acquittal because the state failed to prove the requisite mental state and because the state failed to prove circumstances manifesting an extreme indifference to human life. The Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review. *State v. Bynum*, 222 Or. App. 213, 193 P.3d 629, *rev. denied*, 345 Or. 460, 200 P.3d 146 (2008).

Petitioner then filed a petition for state post-conviction relief ("PCR"). Following an evidentiary hearing, the state PCR trial judge denied relief. On appeal, the Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review. *Bynum v. Premo*, 261 Or. App. 584, 326 P.3d 78, *rev. denied*, 335 Or. 668, 330 P.3d 27 (2014).

On February 23, 2015, Petitioner filed a *pro se* Petition for Writ of Habeas Corpus in this court. The court appointed counsel to represent Petitioner, and on August 3, 2015, Petitioner filed a First Amended Petition for Writ of Habeas Corpus alleging the following claims for relief:

**Ground One:** Petitioner's jury trial waiver was not entered knowingly, intelligently, and voluntarily in violation of his right to trial by jury and due process of law as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

**Ground Two:** Petitioner was denied his right to effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when his trial counsel:

    A.    Failed to thoroughly investigate and present helpful and exculpatory evidence, including expert testimony, concerning the medical issues in this case including, but not limited to, whether the cause of death was "shaken baby syndrome;" and

    B.    Failed to properly advise and insure that petitioner's jury trial waiver was knowing, intelligent and voluntary.

**Ground Three:** Petitioner was denied the effective assistance of appellate counsel as guaranteed by the Fourteenth Amendment to the United States Constitution when appellate counsel failed to raise on appeal the following errors:

    A.    Petitioner's waiver of trial by jury was not knowing, intelligent, and voluntary;

    B.    The trial court failed to determine that the waiver of trial by jury was knowing, intelligent, and voluntary;

    C.    the trial court's denial of the motion for judgment of acquittal.

**Ground Four:** Petitioner's conviction was in violation of his rights under the Fourteenth Amendment to the United States Constitution because there was insufficient evidence to convict him of the crime charged. The trial court should have entered a judgment of acquittal because the State did not prove guilt beyond a reasonable doubt.

In his Brief in Support, Petitioner addresses only the claims alleged in Ground Two(A) and Ground Four. As to the claim alleged in Ground Two(A), Petitioner concedes the claim was procedurally defaulted, but argues he has established actual innocence to excuse the procedural default. Respondent argues that Petitioner has not established actual innocence, that the trial court's

3 - FINDINGS AND RECOMMENDATION

decision to deny Petitioner's motion for judgment of acquittal is entitled to deference, and that Petitioner is not entitled to relief on the claims not addressed in his Brief in Support.

**EVIDENCE AT TRIAL**

As noted, Petitioner was charged with Murder by Abuse of his two-year-old son RB. Under Oregon law, a person is guilty of Murder by Abuse if that person "recklessly under circumstances manifesting extreme indifference to the value of human life, causes the death of a child under 14 years of age . . . and . . . [t]he person has previously engaged in a pattern or practice of assault or torture of the victim." Or. Rev. Stat. § 163.115(1)(c)(A).

I.    **Petitioner's Earlier Interactions with RB**

RB's mother, Chandra Sims ("Sims"), testified at trial. Except for a short time in the first few months after his son was born, Petitioner did not live with Sims and RB (who resided together near Seattle, Washington). Trial Transcript Volume (referred to hereafter for simplicity of reference as "Vol.") 5, pp. 67-74.[1] Petitioner visited RB only intermittently. *Id*. In April 2003, Sims and RB moved to Arkansas, where they lived in poverty. Vol. 5, p. 81 In early June of 2003, Petitioner visited Sims and RB in Arkansas. Because of her living situation, Sims agreed to let Petitioner take RB back to Oregon. She testified: "I wrote a paper, a letter saying that I would give [RB] to [Petitioner] until I could do better and then I wrote another paper saying that he could have [RB] until July 15th." Vol. 5, p. 89. Petitioner did not, however, return RB to Sims on July 15 because, according to Sims, Petitioner claimed that he had to "get some stuff in line" before he could return RB. Vol. 5, p. 97.

---

[1]"Vol." refers to the trial transcript, which encompasses thirteen volumes.

4 - FINDINGS AND RECOMMENDATION

In early to mid-June, Petitioner brought RB to the Chelsea Park Apartments in Beaverton, Oregon, where Petitioner lived with his girlfriend, Heather Johnson. At the time Petitioner brought RB to live in Oregon, RB was not fully toilet trained. Petitioner testified that Johnson acted like a mother to RB; she fed him, bathed him, changed his diapers, and "all that." Vol. 13, pp. 162-165.

A week or so after RB arrived, two of Petitioner's other children from a different mother than Sims (a seven-year-old son and five-year-old daughter) moved in with Petitioner and Johnson as well. Petitioner testified that Johnson eventually became "kind of overwhelmed" by the situation. Vol. 13, pp. 168-69.

Michael Cook and Kimberly Manders, neighbors of Petitioner and Johnson in the same apartment complex, testified that Petitioner, Johnson, and RB came to their apartment for dinner a day or two after RB arrived in Oregon. Petitioner told Cook that RB had not been subject to discipline before, that he was "back-sassy," and that he needed "whoopings" to make him mind. Vol. 6, pp. 172-78; Vol. 7, pp. 6-15, 17-18. Cook testified that at some point in the evening, RB resisted Petitioner's orders to "go potty," and Petitioner yelled at RB to "get your ass in there and go pee." Petitioner then grabbed RB by the arm and dragged him down the hallway into the bathroom. RB wet his pants on the way there. Cook said he heard a sound as if someone had dropped a sack of potatoes and then a sound as if Petitioner had smacked RB. RB started screaming, and Petitioner told him to "go pee." When they came out of the bathroom a few minutes later, RB was still crying. Vol. 6, pp. 178-81, Vol. 7, p. 6.

Manders testified that she did not hear any spanking or hitting sounds or any yelling by Petitioner while they were in the bathroom, and said that Petitioner did not assault RB. Vol. 7, pp. 15-17, 25. Manders had earlier told a defense investigator that Petitioner did not drag RB through

the apartment, that he had taken RB into the bathroom to clean up after eating, that RB had urinated in his pants, that there was no yelling or screaming, and that it was "no big deal." Vol. 14, pp. 5-6, 8. Johnson testified that she told Petitioner to take RB to the bathroom and RB started fussing and crying because he didn't want to go. She said Petitioner did not drag RB and she did not hear any thuds or sounds of a spanking or a beating. Vol. 14, p. 5-6, 8.[2]

Sometime after the incident at their apartment, Petitioner told Cook and Manders that he was having a lot of trouble toilet training RB and that it frustrated him that RB "couldn't get it." Petitioner said that his other son was helping so that Petitioner "did not have to deal with this shit." Vol. 6, pp. 181-82; Vol. 7, pp. 20, 22.

Stacy Taylor, the maternal grandmother of the two other children living with Petitioner, babysat RB on two occasions. Taylor testified that RB appeared to be quiet and afraid to move or do anything when in Petitioner's presence, and that RB seemed to be reluctant to go home with Petitioner. Vol. 7, pp. 190-91, 94-98. Taylor also testified that she discussed Petitioner's disciplinary methods with him. Petitioner told her he spanks his children if they do not mind him "the second time around," and he said "I want my children to fear me." Vol. 7, p. 204.

Petitioner's uncle Ted Williams and Williams's fiancé Michelle Duncan cared for RB for a few days between July 4 and July 11. According to Duncan, RB did not feel well and was lethargic; his "ribs and tummy" seemed to "be in a lot of pain" and he would wince or "squeak" when picked up or hugged roughly by his brother." Vol. 11, pp. 191-95. Duncan noticed a mark on RB's

---

[2]Petitioner denied that there was any "abuse or violence" at the apartment of Cook and Manders. Petitioner testified that Cook disliked him because Cook knew that Petitioner had had a sexual relationship with Manders. Vol. 13, p. 165-66, 228-29. Manders denied that she and Petitioner had had a sexual relationship. Vol. 14, pp. 10-11.

backside "that didn't look like it was abuse, it looked like it was an untaken care of wound." Duncan further said, "[i]t looked like he might have had like a diaper left on too long or something," and that at the time, the mark was "old" and "scabbing."[3] Vol. 11, pp. 197-98.

Duncan further testified that she and other of Petitioner's family members did not see Petitioner and RB between July 11 and July 30. She said, "we had continually tried to get a hold of the children and that I knew other family members had also. And he was a no-show. He wasn't coming around." Vol. 11, p. 207.

On July 11, 2003, Dr. Teri Hero examined RB at the Family Care Medical Clinic because RB had "significant" blisters on his lips from a viral infection and mild excema rash on his forearms and chest. Dr. Hero noted that RB seemed unusually compliant, withdrawn, and in need of physical touching, but she did not notice any unusual cuts or bruises on RB's arms or legs. Vol. 7, pp. 49-56, 60-62.

On July 20, 2003, Johnson left the couples' apartment to stay at her mother's house. She did so to get a break from the children and have some time to herself. Vol. 11, pp. 249-52, 265-66, 279. At about that same time, Petitioner telephoned his former girlfriend Angela Gill, who is the mother of Petitioner's three-year-old son (who did not reside with Petitioner). Gill testified that Petitioner told her he was having a difficult time. He said that he could not get daycare and therefore could not get a job and medical insurance for his children. Petitioner told Gill that he was having a difficult time toilet training RB, that he felt RB "could go potty on the potty" despite his young age, that he did not want to change "poopy diapers" because it was "nasty," and that he felt frustrated and

---

[3]Johnson apparently saw the same sores on RB's bottom; Petitioner told her that they were caused by RB sleeping in wet training pants. Vol. 11, pp. 280, 284, 286.

"trapped." Vol. 7, pp. 155, 159, 162-63. Gill testified that Petitioner sounded "sad, frustrated" and defeated, but not angry in general or at RB in particular. Vol. 7, pp. 176-76.

A few days before RB sustained the injuries that resulted in his death, Petitioner called Laurie Sutfin, the maternal great-aunt of his five-year-old daughter and seven-year-old son. Sutfin expressed concern that the children were afraid of Petitioner, and he responded, "Yes, I put fear into my children and I only have to tell them once." Vol. 14, pp. 99, 101, 104.

## II.    Evidence of the Night of the Incident

On July 29, 2003, between 9:15 and 9:45 p.m., tenants in the apartment directly below Petitioner's heard two abnormally loud, "pretty forceful" bangs that most likely came from Petitioner's living room. The two "bangs" were separated by either a few seconds or one to two minutes, and the first was slightly louder than the second. Neither tenant heard any voices or crying accompanying the noises. Vol. 6, pp. 146, 150-152, 154-55, 157-60.

At approximately 10:00 p.m. that night, Petitioner called RB's mother Sims in Arkansas (where it was midnight). Vol. 5, p. 100. Petitioner first asked Sims if she was engaging in sexual intercourse. After a brief conversation on that topic, Petitioner told Sims that he thought he had hurt RB, and that it had happened "[a] couple hours ago." Vol. 5, p. 104. Petitioner explained that he had been spinning RB around and that he had tripped over his daughter and dropped RB, who hit his head "hella hard" on either the couch or the table. Vol. 5, p. 102-03. Petitioner said that RB had not become unconscious and that he had "gotten up." Petitioner said he had fed RB and that RB was groggy and sleepy, and was asleep when he called. Petitioner said that he had not called a doctor, and when Sims told him to take RB to the hospital, Petitioner said he could not do that because he

had the two other children with him. Sims asked Petitioner to call a doctor, and Petitioner told her he would do so. Vol. 5, pp. 100-105.

Sims testified that she called Petitioner back a short time later, at 10:25 p.m. Petitioner told Sims he had called the hospital and that the doctor had told him to bring in RB in the morning if he did not feel better.[4] During this second phone conversation, Petitioner told Sims he did not want to take RB to the hospital because RB had "whip marks" on his legs from being spanked with a "switch." Vol. 5, pp. 105-08, 110-11. Sims told Petitioner to prop RB up on a pillow in case he threw up and to wake him every two hours to check on him. Vol. 5, pp. 107-08. Sims also told Petitioner that she would call back in two hours and that they would check in through the night. Vol. 5, p. 108. When she tried to call back about two hours later, however, no one answered the phone.

The next morning Petitioner called Heather Johnson at her place of work at Oregon Health Sciences University ("OHSU") at 8:30 a.m. The hospital paged Johnson, who immediately called Petitioner. Petitioner told Johnson that he "had been playing helicopter with the kids and he had slipped, and lost his balance, and dropped [RB]." Vol. 11, pp. 287-88. Petitioner told Johnson RB had hit his head first on the side of the couch and then on the floor. He said RB was "dazed" the night before, but that he had given RB some water, which RB drank, and that he had then put RB to bed. Vol. 11, pp. 287-88, 291. Johnson testified that she told Petitioner to take RB to the hospital right away. Vol. 11, p. 291.

Petitioner did not arrive at the OHSU emergency department until 10:00 a.m. Vol. 5, pp. 152-53. When he arrived, he was carrying RB over his shoulder. RB was breathing but unconscious, and medical personnel immediately took RB into the resuscitation room. Vol. 5, pp.

---

[4]Petitioner had not, in fact, called a doctor or the hospital.

155-56. A defense expert later testified that RB was "basically brain dead" when he arrived at the hospital. Vol. 10, pp. 167-68.

Shortly after their arrival and while RB was being initially treated, OHSU social worker Laurie Burke spoke with Petitioner. According to Burke, Petitioner was unusually calm, "almost laid back," and not anxious as most parents would be under the circumstances. Vol. 5, pp. 166, 170-71, 182. Heather Johnson, who was present for the conversation with Burke, testified that Petitioner, although quiet, was upset and scared. Vol. 13, p. 258.

Burke asked Petitioner what had happened. Petitioner told Burke that the night before, about 8:00 p.m., he was giving RB a "helicopter" ride by taking him by one arm and one leg and swinging him around in circles, when Petitioner tripped over a coffee table and fell, and RB hit his head on the ground.[5] When Burke asked whether RB had been alert after he hit his head, Petitioner said, "Well, he mumbled a bit and asked for some water and I gave him some water or juice and then he went to bed." Vol 5, p. 174. Petitioner told Burke that RB was awake the next morning around 6:00 a.m., and, although sleepy, responded to a question asked by Petitioner. When Burke asked Petitioner why he delayed in bringing RB to the hospital, Petitioner said that he brought RB in after his girlfriend told him to do so. Vol. 5, pp. 171-78.

At approximately 1:00 p.m., OHSU social worker Karen Phifer spoke to Petitioner. Phifer testified that Petitioner told her that he had played "helicopter" or "airplane" with RB and the other children, which he described as grabbing each child by one hand and one foot and twirling them around. When he was spinning RB, he got dizzy and stumbled into a coffee table, which caused him

---

[5]At that point, Burke testified, Petitioner's seven-year-old son interrupted Petitioner and reminded him that RB had first hit his head on the davenport before hitting the ground. Vol. 5, p. 172.

to drop RB. RB hit his head on the couch and then fell to the floor. Petitioner told Phifer that RB cried after the incident until he "kind of pooped out," but was able to sit up and have some water after the incident. Vol. 6, pp. 106-07. When Phifer began to question Petitioner about RB's medical history, Petitioner interrupted her and told her that the marks on RB were caused by "a little belt that [Petitioner] used during potty training." Vol. 6, p. 110.[6]

Later that day, Beaverton Detective Daniel Kelly spoke with Petitioner at the hospital. Detective Kelly testified that Petitioner told him that the night before he began "roughhousing" with his children. He gave his daughter a "helicopter" ride, grabbing her by her ankle and spinning her around. He then gave a "helicopter" ride to RB, a second ride to his daughter, and then a second ride to RB. He also "tumbled" RB "about twice," that is, he held RB's arms to his sides and flipped him backwards. Vol. 8, pp. 54-56.

Petitioner told Detective Kelly he then gave RB another "helicopter" ride, and that as he was spinning RB he lost his balance and stumbled backwards onto a loveseat. Petitioner lost hold of RB who "went flying" and hit the floor. Petitioner said RB appeared dazed and cried "for just a second." When Petitioner picked up RB and put him over his shoulder, RB "gave out a little gasp, like his last breath" and "like went to sleep." Vol. 8, pp. 56-59.

Petitioner told Detective Kelly he was frightened and worried, and put RB in Petitioner's bed and immediately called Sims, who told Petitioner to awaken RB and not let him go to sleep. Vol. 8, pp. 59-60. Petitioner and his daughter awakened RB, who opened his eyes and looked around. When Petitioner asked if he was okay, at first RB did not respond, but then he shook his head "yes"

---

[6]Phifer testified that she know what marks Petitioner was talking about because she had seen RB and noted the marks on the "fronts of his legs and the sides of his legs, and that they were on more than just one spot on his body." Vol. 6, p. 111.

or "no" to everything said to him. RB was weak and could not sit up on his own; Petitioner had to hold him up. Petitioner told Detective Kelly he gave RB a sip of water from a glass, but that he must have given him too much because the water flowed back out through the sides of RB's mouth. Vol. 8, pp. 62-64. Petitioner told Detective Kelly that at some point he tried to feed some ice from an "ice cup" to RB with a spoon; RB "tasted" the ice, but did not eat it, and then "nodded back off." Vol. 8, pp. 62-64.

Petitioner told Detective Kelly that he described these events to Sims who had remained on the phone all during that time, and that she said RB probably had a "little bit of a concussion" and that "he was probably okay." Vol. 8, pp. 64. Petitioner told Detective Kelly that he told Sims that he was reluctant to take RB to the hospital because he had spanked RB with a child's belt a week earlier in response to RB "peeing" and "pooping" on himself, and that the spanking had left marks. Petitioner was afraid that the hospital would call the police and he did not want to go to jail, but he told Sims he would take RB to the hospital if RB was not up in the morning. Vol. 8, pp. 65-68.

Petitioner told Detective Kelly that he awoke at 7:00 a.m., and that when he went to check on RB he pulled on his toe, but RB was "still out of it." He said he paged Johnson at the hospital at 7:00 a.m., and that when she returned his call and he told her what happened, she said to bring RB to the emergency department. Petitioner told Detective Kelly that he should have called Johnson earlier, but he was "nervous and scared about the marks he had left on RB[.]" Petitioner said that after speaking to Johnson and dressing the children, he brought RB to the emergency room "right away." Vol. 8, pp. 70-73.

In response to Detective Kelly's questions, Petitioner explained that he began using a belt on RB when RB first started toilet training. When asked why he used a belt, Petitioner said he had

used it only one day and that all of the injuries on RB were from that one day; he didn't need to use it after that because it was effective and RB used the "potty" afterwards. Petitioner said he did not notice he made marks on RB until Johnson angrily pointed them out and "attacked" him, and that Johnson threw away the belt. Vol. 8, pp. 82-84.

Petitioner agreed to accompany Detective Kelly and another officer to Petitioner's apartment to show them what had happened. At the apartment, Petitioner told Detective Kelly that he had swung RB around face up, and tripped over the leg of a coffee table and fell onto the love seat. He showed Detective Kelly where RB had "flown to the floor" approximately six feet, ten inches from where Petitioner let go of him. Petitioner said RB was still face up when he hit the ground, and that Petitioner did not actually see RB strike the arm of the sofa because he was falling over at the time. Vol. 8, pp. 93-95, 107-08, 136.

When asked about the different ages of the marks on RB, Petitioner admitted striking RB with a small, leather belt on two separate occasions two weeks apart. On each occasion, RB had soiled himself and Petitioner hit with the belt about 10 times. Petitioner admitted hitting RB harder than he should have, but said that RB had not had any toilet-training accidents on July 29. Vol. 8, pp. 100-07.

The officers then transported Petitioner to the Beaverton Police Department. There, after the officers discussed the extent of RB's injuries, Petitioner stated for the first time that he actually dropped RB twice. He said he first dropped RB when he was "flipping" him in the air at about shoulder height and RB fell almost vertically on his head on a coffee table, and then onto the floor. He said the second time he dropped RB "he did so while playing helicopter." Vol. 8, pp. 129-131.

In demonstrating how he dropped RB, Petitioner never indicated that he raised RB over the top of his head. Vol. 8, p. 139.

Petitioner stated that after he had dropped RB, he was afraid he had broken RB's neck. Vol. 8, pp. 123-24. When asked about RB's broken ribs, Petitioner said he might have broken them when he attempted to perform CPR on RB after he carried him into the bedroom. Vol. 8, pp. 124, 129. Petitioner initially denied shaking RB, but eventually stated that he did so after the second time RB fell. Petitioner denied that it was a violent shaking, explaining that the shaking "did not cause his head to go all the way forward and all the way back, although RB was limp when he shook him." Vol. 8, p. 130.

Petitioner testified in his own defense at trial. He stated that he was roughhousing with all three children. He said he did various things such as flipping a child or throwing the child up in the air and catching him or her, or picking the child up by the crotch and shoulder and pretend-slamming or gently "bouncing" them on the couch or twirling them around by holding their ankle and wrist. Petitioner said the roughhousing went on for approximately 15 minutes. Vol. 13, pp. 178-79, 193-201, 204, 243-47.

Petitioner testified that RB was injured when Petitioner "twirled" RB in his hand and then accidentally dropped him. He described spinning RB around with RB in the palm of his upward-facing hand with his arm extended over his head. Petitioner tripped either over another child or the coffee table and RB fell from his grasp. Petitioner described RB hitting the coffee table head first, then the floor. Based on the fact that Petitioner is six feet, six inches tall and that he had his hands raised while holding RB, Petitioner estimated that RB fell approximately seven feet. Vol. 13, pp. 205-09, 233-34, 239-41, 285.

Petitioner testified that when he picked RB up, "he blacked out on me" which Petitioner said scared him, causing him to drop RB again; this time RB fell onto the couch and then the floor. Vol. 13, p. 209. Petitioner said that when he picked RB up the second time, RB was "groggy," "limp-like," and did not appear to be breathing. Petitioner said, "I kind of like blew in his mouth, made his jaws just swell up and he kind of gagged and then I was like, okay, you all right, and took him to the room and I laid him down." Vol. 13, p. 212.

Although Petitioner described RB as "groggy," he testified that he did not believe RB was seriously injured. He testified that he immediately called Sims, and that RB "got back up" and was later "munching" on a "little icy," or flavored ice cup, that Petitioner stated he had prepared. Vol. 13, p. 214. When he could not awaken RB the next morning, Petitioner testified that he paged Johnson, and that she told him to bring RB to OHSU.

Petitioner testified that he had not been angry at RB that evening and that he did not intentionally assault RB; he did not deliberately slam RB into an object or shake him. Vol. 13, pp. 221-22, 255-56, 289. As to the inconsistencies about the incident in his earlier statements to Detective Kelly, Petitioner explained that Detective Kelly did not understand Petitioner's southern, African-American slang, or that he was "brief" in his responses to Detective Kelly because he wanted to end the questioning and return to the hospital to see his son. Vol. 13, pp. 247-53, 255-62, 279-80, 288.

III.    **Medical Evidence for the Prosecution**

Several doctors, including Dr. Clifford Nelson, the Deputy State Medical Examiner, testified that RB's injuries were not consistent with Petitioner's varying accounts of what occurred. Dr. Nelson performed the autopsy on RB. Dr. Nelson described the injuries on RB's body; he testified that RB had "multiple looped whip marks in various degrees of healing" which were located on his back, chest and legs, and noted that "his legs were the most heavily covered area with these whip marks. Vol. 10, pp. 6-7. Some of the whip marks were scarred, more recent whip marks had scabbed over, and other whip marks appeared to be "fresher." Vol. 10, p. 7.

Dr. Nelson testified that there were three older rib fractures, which he estimated to be anywhere from two to four weeks old. Vol. 10, p. 19. He also observed a bruise measuring 2 3/4 inches by 2 3/4 inches on RB's left flank area. Vol. 10, p. 12. Under the bruise, Dr. Nelson noted that there were two additional "fresh rib fractures" and "several internal injuries." Vol. 10, p. 12. RB suffered a bruised left lung and torn pleura and inferior vena cava (*i.e.*, the largest vein in the body supplying blood to the heart). Vol. 10, p. 31-32. The tear in the vein was a "relatively small tear," but as a result, 300 mm of blood had accumulated in RB's chest cavity. Vol. 10, p. 31-32 Dr. Nelson explained that it would take "an extremely severe blow" to cause such damage, and that, although it would take time, RB could have died from this injury had he not died from the more significant head injury. Vol. 10, pp. 31-32.

Dr. Nelson opined that RB's "most rapidly fatal and significant injury was his head injuries." Vol. 10, p. 34. He named RB's cause of death as "Battered Child Syndrome with terminal closed

head trauma."[7]  Vol. 10, p. 44.  Dr. Nelson described several bruises on RB's head, including a bruise behind his left ear, a "deep" bruise on the left side of his forehead caused by hitting his head against something hard with a "moderate to severe force," and a "deep" bruise on the back of the left side of his head.  The bruise on the back of RB's head corresponded to his internal brain injury, and was caused by a "more significant impact."  Vol. 10, pp. 19-21.  Dr. Nelson also noted a faint bruise on RB's right forehead and an abrasion on the left side of his jaw and chin.  Vol. 10, pp. 138-39.

Dr. Nelson testified that RB had "massive retinal hemorrhage with fresh blood extending throughout every layer of the retina" and a "relatively fresh optic nerve hemorrhage."  Vol. 10, pp. 19-21.  He stated that RB's retinal and optic nerve hemorrhages indicated that he was exposed to the "highest level of force in an acceleration/deceleration injury."  Vol. 10, p. 44.

Dr. Nelson testified that the bruise on the back-side of RB's head corresponded to internal head injuries, which resulted in the swelling of his brain, such that portions of his brain were deprived of blood and began "to die and necrose or degenerate."  Vol. 10, pp. 21, 34-37.  The swelling on the left side of RB's brain was so significant that it caused a "mid-line shift."  The swelling in RB's brain "pushed down on his brain stem . . . and that causes his heart to stop."  Vol. 10, p. 61.

Dr. Nelson testified that it would take "a severe amount of force" to cause the injuries that RB suffered, such as from a shaking or a slamming, or by throwing him across the room into something.  Vol. 10, pp. 39-40.  Dr. Nelson would not expect RB to have the injuries he had if he had merely fallen from a distance of ten feet; he explained he would not expect to see retinal

_____

[7]"Battered Child Syndrome" is a diagnoses applied to children with repeated (meaning more than two) injuries caused by abuse or "inflicted trauma."  Vol. 10, p. 45.

hemorrhaging and "couldn't expect to see the optic nerve hemorrhage that RB has." Vol. 10, p. 43.

Given the extent of RB's injuries, Dr. Nelson would have expected RB to go "immediately floppy" after receiving his injuries, unable to eat or drink. He testified that a child with a severe "closed head" injury normally shows immediate symptoms such as abnormal breathing and a marked diminishment or loss of consciousness; RB was likely either unconscious or at least in a diminished state of consciousness, such that he would appear "disconnected." Vol. 10, p. 39.

Several doctors in addition to Dr. Nelson testified that RB's injuries were not consistent with Petitioner's accounts. Dr. Eileen Kirby, a pediatrician who treated RB at OHSU, testified that she did not believe a fall from a distance of approximately six feet would have caused RB's injuries, and that "no explanation I've been given explains this child's injuries." Vol. 3, pp. 210, 218. Given the constellation of injuries suffered by RB and the explanation given by Petitioner for those injuries, Dr. Kirby diagnosed RB with child physical abuse, to a reasonable degree of medical certainty. Vol. 3, pp. 222-23.

Dr. Jeris Hedges, an emergency room physician, testified that given the "massive" and "sizeable" head injury, he did not believe that RB could have functioned normally after the injury occurred. Vol. 6, p. 38. He believed that RB would have lost consciousness as a result of the injury, and that he could not say to what degree RB would have regain consciousness, but that his responses would have been "significantly diminished" and it would have been difficult for him to interact. Vol. 6, p. 40. Dr. Hedges testified that it is possible, however, to have a period of lucidity following an injury during which one can speak and interact when what is to become a fatal blow is focused on a limited part of the cerebrum. Vol. 6, 41. Dr. Hedges believed that RB's injury was consistent with his head hitting a hard object. Vol. 6, p. 71. The injury was also consistent with having been

severely shaken, but Dr. Hedges acknowledged that he did not "know the mechanism" of "shaken baby syndrome." Vol. 6, pp. 74, 91.

Dr. Joseph Zenel, Medical Director of the "suspected child abuse and neglect team" at OHSU, testified that RB's injuries were based on a combination of blows to the head as well as severe shaking left and right. Vol. 6, pp. 204, 236-37, 242. He diagnosed RB as suffering from both Battered Child Syndrome and Shaken Infant Syndrome. Vol. 6, pp. 240, 244. Dr. Zenel based his diagnosis on the nature and extent of the physical injuries to the brain, the multiple bruises and cuts, and the one-to-two-week old rib fractures, and "a lack of proper history to explain those injuries." Vol. 6, pp. 237-38, 243-45, 252, 265-66.

Dr. Zenel testified that the account that Petitioner gave to OHSU personnel was not consistent with the severity of RB's injuries. Vol. 6, pp. 235-36. He testified that spinning RB around and then accidentally dropping him, flinging him, or throwing him a short distance onto the floor or against the wall could not account for the injuries. Vol. 6, pp. 235-36, 243. The injuries to RB's brain could only have been the result of "high energy impact, rotational movement back and forth," or falls from a great height; Dr. Zenel compared RB's head injury to what might be seen in children involved in serious automobile accidents in which they were unrestrained and there was a "high energy impact." Vol. 6, p. 242.

Dr. Thomas Koch, a professor of pediatrics and neurology and the Director of Child Neurology at OHSU, was on duty and treated RB. Dr. Koch testified that he would not expect RB to have suffered his injuries from a six- to seven-foot fall onto a hard surface, such as a desk. Vol. 14, pp. 115-17, 124. When asked the type of case he would expect to see injuries as significant as those suffered by RB, Dr. Koch testified that the severity of RB's head injury and the presence of

19 - FINDINGS AND RECOMMENDATION

bilateral retinal and pre-retinal hemorrhages indicated, in the absence of a motor vehicle accident or good explanation, that the injuries were "inflicted" or "non-accidental head trauma." Vol. 14, pp. 115, 122-23, 125-28.

## IV.     Medical Evidence for the Defense

Petitioner's trial attorney called Dr. Janice Ophoven, a forensic pathologist with extensive training and experience in pediatric forensic pathology. Vol. 10, pp. 128-32. Dr. Ophoven reviewed the extensive medical records pertaining to RB's treatment at OHSU, as well as the autopsy report prepared by Dr. Nelson. Vol. 10, p. 133. Dr. Ophoven testified that RB suffered from rickets at the time of his death, and that the disease made him much more susceptible to fractures, such that broken ribs could be caused by "ordinary childhood pratfalls[.]" Vol. 10, pp. 141, 144. According to Dr. Ophoven, RB's rib fractures may have been due to an active case of rickets at the time of RB's death. Vol. 10, p. 144.

Dr. Ophoven further testified that the tear in RB's inferior vena cava must have occurred during treatment at the hospital. Vol. 10, pp. 138-49,1 194-96, 205-07, 221-23. She also opined that RB died from an ischemic infarction, that is a stroke. Vol. 10, pp. 132-37, 172-74, 181, 186, 208, 217. Dr. Ophoven noted that the pediatric neurologist who assessed RB while he was in a coma suggested the possibility that there may have been something wrong with RB's internal carotid artery, one of the blood vessels that carries blood to the brain. Dr. Ophoven noted that a MRI indicated there was an occlusion or slow flow in the internal carotid artery where it passes through the skull at the petrous bone and enters the brain. Vol. 10, pp. 149-53, 172, 213. Based on that and other evidence, Ophoven opined that RB suffered from a traumatic impact to the head, that he suffered no blunt force trauma to the brain as the result of that trauma, but that the internal carotid

artery suffered complicating trauma as a result of the impact - his "landing sideways on [his] head" most likely stretched the artery and tore its less flexible inner layer. As a result of the injury to the artery, the artery became occluded and caused a stroke, and such an occlusion may result from a low-force blow. Vol. 10, pp. 166, 173, 179-81, 191-93, 217, 224-30.

Finally, Dr. Ophoven testified that while the "differential diagnosis" must include Battered Child Syndrome and that trauma was the cause of death, the issue was whether the trauma was inflicted or accidental, and that, in this case, the injuries could have occurred either by accident or been inflicted. Vol. 10, p. 137. Dr. Ophoven testified that RB's case was not a "classic battered child" case and it was not a "typical rotational impact injury." Vol. 10, pp. 181-82. Based on her experience and her understanding of biomechanics, Dr. Ophoven found the history of the accident given by Petitioner, *i.e.*, that the child was dropped in the course of some kind of spinning play from a height of five or six feet, to be consistent with the medical findings. Vol. 10, pp. 185-88, 208-10.

Defense witness Dr. Marvin Miller confirmed Ophoven's conclusions. Miller testified that he believed, based on medical evidence, RB had active rickets and may also have had scurvy. Vol 13, p. 23. Miller stated that RB ultimately died from a tear in his internal carotid artery, which was under-protected by the petrous bone as a result of his rickets. Vol. 13, p. 26 Further, if RB had scurvy, then the artery would be more likely to tear. Vol. 13, pp. 8-36, 43-48.

**V.    The Prosecution's Rebuttal Medical Evidence**

On rebuttal, the state presented the testimony of Dr. Robert D. Steiner, the head of the Division of Metabolism in the Department of Pediatrics at OHSU. Vol. 14, p. 9. Dr. Steiner testified that although RB had a severe case of rickets when first diagnosed at 16 months, the lab results from the time of his death showed much improvement in his condition. Vol. 14, pp. 16-17.

Steiner further testified that while rickets in infants can cause bones to be predisposed to fracture and breaking, by the time a child reaches two years of age the propensity to fracture is "really not significantly reduced over normal." Vol. 14, p. 21. Steiner stated that children RB's age with rickets "do not get rib fractures without significant trauma, just like normal children." Moreover, the fact that, in RB's case, there was significant bleeding around his fractured ribs led Steiner to "the conclusion even more strongly in this particular case" that RB suffered significant trauma because "fractures of the ribs that would occur with minimal trauma would not be associated with bleeding." Vol. 14, p. 23. Dr. Steiner also testified that no evidence in the medical record indicated RB had scurvy. Vol. 14, pp. 24-25.

Dr. Koch also testified on rebuttal. He stated that he initially indicated a differential diagnosis which states "Ideology may be related to neck/carotid trauma with a carotid dissection." Vol 15, p. 118. Once the MRI was obtained, however, that did not remain part of the differential diagnosis, as Dr. Steiner stated "[t]here wasn't any evidence on the MRI to suggest that there was a carotid dissection." Vol. 15, p. 118.

Dr. Nelson testified on rebuttal that it would be virtually impossible for an injury to occur to the internal carotid artery without a fracture to the petrous bone or evidence of the carotid dissection below the petrous bone, neither of which was present in RB's case. Vol. 16, pp. 72-75. Dr. Nelson further testified that during the autopsy he examined RB's bones, specifically the costral chondral junction of RB's ribs, and found no evidence of active rickets; RB's bones showed normal growth. Vol. 16, pp. 108.

**DISCUSSION**

**I.      Ground Two(A) - Ineffective Assistance of Counsel for Failure**

In Ground Two(A), Petitioner alleges that trial counsel was ineffective because he failed to investigate and present helpful and exculpatory evidence concerning the medical issues in this case, including but not limited to, whether the cause of death was "shaken baby syndrome." Petitioner acknowledges the claim is procedurally defaulted, but argues the default is excused because he has demonstrated actual innocence.

**A.      Legal Standards**

In *Schlup v. Delo*, 513 U.S. 298 (1995), the Supreme Court addressed the process by which state prisoners may prove "actual innocence" so as to excuse a procedural default. The Court explained that in order to be credible, a claim of actual innocence "requires petitioner to support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial." *Id*. at 324. Ultimately, a petitioner must prove that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *Schlup*, 513 U.S. at 327; *Bousley v. United States*, 523 U.S. 614, 623 (1998). In making this determination, this court "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." *Schlup*, 513 U.S. at 332.

In assessing a claim of actual innocence under *Schlup*, the court must make "a probabilistic determination about what reasonable, properly instructed jurors would do." *House v. Bell*, 547 U.S. 518, 538 (2006) (citing *Schlup*, 513 U.S. at 329). The court does not make an independent factual determination about what likely occurred, but instead assesses the likely impact of the evidence on

23 - FINDINGS AND RECOMMENDATION

reasonable jurors. *Id.* The *Schlup* standard is demanding and permits review only in the "extraordinary case." *Id.* (citations omitted). The petitioner must "demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt–or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *Id.* Put differently, *Schlup* is not a trial do-over. *Lee v. Lampert*, 653 F.3d 929, 946 (9th Cir. 2011) (Kozinski concurring). In order to pass through the *Schlup* actual-innocence gateway, a petitioner must persuade the court that "more likely than not," "every juror would have voted to acquit him." *Id.*

### B. Analysis

In support of his claim of actual innocence, Petitioner presents to this court an expert report from Jill Cobb, M.D.[8] Memorandum in Support, ECF No. 41, Exh. 1. Petitioner contends that the contents of Dr. Cobb's report cast significant doubt on the State's expert testimony about shaken infant syndrome and the validity of the opinion testimony that Petitioner did not accidentally cause the death of his son.

In her report, Dr. Cobb first addresses the whip marks on RB's legs and buttocks. She opines that RB received the injuries from being hit with a belt or looped cord, and that they may have occurred all within the same time frame or may have been separated by a day or two. In any event, the injuries occurred "perhaps days" before RB received his traumatic head injuries.

Dr. Cobb then addresses RB's broken ribs. She notes that the fractures of ribs 3, 4, and 5 "are in the healing stage and the ages of these fractures dates them at least 2 weeks of age." As to

---

[8]Dr. Cobb states in her report that she has been a Medical Examiner since 1985. She does not provide any further information as to her qualifications to provide an expert opinion to this court.

the fractures of ribs 6 and 7, she notes that they exhibit evidence consistent with a recent injury. Assuming that RB suffered rickets at the time of his death, Dr. Cobb states that "[v]arying opinions exists [sic] about the susceptibility of these diseased bones to injury with some experts stating that bones can fracture easily and others suggesting the opposite. She admits she "was unable to determine with any scientific certainty what kind of force was used to create these rib fractures and whether or not [Petitioner] was responsible for them." Without further discussion on the issue, Dr. Cobb then opines that the ribs could have been fractured during an impaction with the table or floor.

With respect to RB's brain injuries, Dr. Cobb notes that the "collection of the acute injuries consisting of bruising of the scalp, right ear, forehead contusions, subdural hemotoma, retinal hemorrhage and cerebral edema are consistent with blunt impact trauma to the head." She rejects the prosecution's contention, however, that these injuries could only have happened by severe shaking or severe impact with an object or by being dropped from a height greater than ten feet. Dr. Cobb opines instead that the injuries to RB's brain "could have occurred from being released from the grip of the person swinging him and impacting a table, sofa and the floor." According to Dr. Cobb,

> Reconstructing the scenario, [Petitioner], states that he was swinging [RB] playing "helicopter." A sudden release caused [RB] to impact the coffee table and sofa. The bruise on the head is partially rectangular in shape and could correspond to an impact with the corner of the table. The momentum that [RB] was encountering could cause shearing of the dural vessels upon impact, even with a carpet floor. Rotational forces could increase the severity of the injuries.

Dr. Cobb focuses on the testimony of Doctors Nelson and Zenel, and faults their conclusion that Petitioner's account of what occurred that night was not consistent with RB's injuries. Specifically, she takes issue with a "diagnosis" of non-accidental trauma "based solely on the triad

of subdural hematoma, retinal hemorrhages and cerebral edema" because studies have shown that these exact findings can and do occur in accidental trauma. Dr. Cobb discusses at length the continued debate in the medical community over head injuries in children, *i.e.*, whether there is any definite marker that can show intentional trauma from non-accidental trauma, and growing evidence that there is not. Dr. Cobb concludes that diagnosing non-accidental trauma based solely on the triad of subdural hemotoma, retinal hemorrhages, and cerebral edema is flawed, and that is possible that the injuries suffered by RB were accidental in nature.

Dr. Cobb's expert opinion is not sufficient to satisfy the requirements under *Schlup* to establish actual innocence. Upon assessing this newly presented evidence in connection with the evidence of guilt adduced at trial, Petitioner has not proved that it is more likely than not that no reasonable jury would have found him guilty beyond a reasonable doubt.

As to the broken ribs, the doctors who actually examined RB concluded that he did not have active rickets at the time of his death. Moreover, Dr. Cobb's opinion is less helpful than the expert testimony trial counsel elicited at trial. Dr. Ophoven testified that RB did suffer from rickets at the time of his death, which made him much more susceptible to fractures such that broken ribs could be caused by ordinary childhood falls. Similarly, Dr. Miller testified that RB could have suffered his broken ribs from ordinary day-to-day activities, like being picked up. Moreover, although Dr. Cobb opines that the newer rib fractures could be consistent with impacting a table or floor, she does not explain how RB could have also suffered a bruised lung and torn vena cava from that same fall.

With respect to RB's brain injuries, Dr. Cobb appears to believe that Doctors Zenel and Nelson diagnosed non-accidental trauma "based solely on the triad of subdural hematoma, retinal hemorrhages and cerebral edema." In fact, as their testimony demonstrates, they considered the

entire constellation of RB's injuries, including the whip marks, multiple bruises, previously broken ribs, freshly broken ribs, bruised lung, torn vena cava, retinal hemorrhaging, optic nerve hemorrhaging, and extensive trauma to the brain. The doctors considered those injuries in the context of Petitioner's changing explanations for the injuries and his reluctance to seek medical care for RB. Moreover, Dr. Cobb does not address the multiple other doctors and specialists at OHSU who concluded that Petitioner's account was not consistent with RB's injuries.

As noted above, trial counsel elicited expert testimony on Petitioner's behalf in an attempt to establish that RB's injuries were the product of an unfortunate accident. Dr. Ophoven testified that RB died from a stroke that resulted from an occlusion in his internal carotid artery, opining that "there may have actually been a problem with the internal carotid artery before he died." She believed that RB suffered blunt trauma to his head, which resulted in "complicating trauma to his internal carotid artery" which resulted in the occlusion and his death. Similar to Dr. Cobb's conclusion, Dr. Ophoven testified that she could not determine from the medical findings whether RB's injuries were caused by "a fall as described by his dad" or by "something else." Likewise, Dr. Miller also stated that RB ultimately died from a tear in his internal carotid artery, which was under-protected by the petrous bone as a result of RB's rickets and scurvy.

In light of the evidence presented, the trial judge apparently rejected the opinions of Doctors Ophoven and Miller. Dr. Cobb's report, which contains a less-developed theory of how RB died, is not sufficiently persuasive that it would cause all reasonable fact finders to acquit Petitioner. Even if Dr. Cobb's report was significantly more persuasive than the expert testimony Petitioner's trial counsel did present at trial, the report still establishes nothing more than an a divergence in medical opinion as to some, but not all, of the factors considered by the doctors who testified for the

prosecution. That is not sufficient to establish that no reasonable fact finder would have believed the medical examiner and the other OHSU specialists, especially in light of Petitioner's failure to provide a consistent account or to seek treatment sooner. *See, e.g., Gimenez v. Ochoa*, 821 F.3d 1136, 1145 (9th Cir. 2016) (rejecting petitioner's claim that no reasonable fact-finder would have found him guilty in light of his new evidence which called into question the diagnosis of Shaken Baby Syndrome based on the triad of subdural hematoma, brain swelling, and retinal hemorrhage, because "[a] jury could still have concluded that [the child] was shaken to death based on her numerous suspicious injuries, [petitioner's] inconsistent statements about [the child's] torn frenulum and his admitted violent behavior"), *cert. denied*, 137 S. Ct. 503 (2016); *Foster v. Oregon*, Case No. 3:06-cv-00689-ST, 2012 WL 3776471, at \*8-9 (D. Or. Mar. 20, 2020), *report and recommendation adopted by* 2012 WL 3763543 (D. Or. Aug. 29, 2012) (concluding that the petitioner had failed to establish actual innocence where he presented several medical experts who disagreed with the state's expert testimony at trial that the child had died from abuse by violent shaking, because a difference of medical opinion is not enough to show that no reasonable fact-finder would have voted to convict him), *aff'd*, 587 Fed.Appx. 356 (9th Cir. 2014).

Accordingly, Petitioner has not established a fundamental miscarriage of justice to excuse the procedural default of his claim that trial counsel was ineffective in failing to thoroughly investigate and present exculpatory evidence and failing to adequately object to the states' expert testimony that RB's injuries were not accidental. Petitioner is not entitled to habeas relief on this claim.

## II.     Ground Four - Insufficient Evidence

In Ground Four, Petitioner alleges the trial judge should have entered a judgment of acquittal because there was insufficient evidence to convict him of the crime charged.[9]  In his Brief in Support, Petitioner presents no argument on this claim beyond the bare statement that the evidence presented at his trial was insufficient to prove beyond a reasonable doubt that he acted with extreme indifference or recklessness in causing the death of his son.

"[E]vidence is sufficient to support a conviction whenever, 'after viewing the evidence in light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (emphasis added) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Cavazos v. Smith*, 565 U.S. 1, 6 (2011).  This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see also Cavazos*, 565 U.S. at 4 (holding that "[i]t is the responsibility of the jury–not the court–to decide what conclusions should be drawn from evidence admitted at trial"); *Long v. Johnson*, 736 F.3d 891, 896 (9th Cir. 2013) (holding that the court must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts), *cert. denied*, 134 S. Ct. 2843 (2014).

---

[9]At trial, Petitioner moved for a judgment of acquittal at the close of the State's case, arguing that the State's evidence "did not make out a prima facie case and a jury could not find him guilty on this record." Vol. 6, p. 72. The trial judge denied the motion.  On appeal, Petitioner argued that "the state failed to prove the requisite mental state" and "failed to prove 'circumstances manifesting an extreme indifference to human life." Resp. Exh. 103, pp. 59-60.  As noted above, the Oregon Court of Appeals affirmed without opinion.

"[A] state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas [review] unless the 'decision was objectively unreasonable.'" *Parker*, 567 U.S. at 43 (quoting *Cavazos*, 565 U.S. at 4). This court must resolve doubts about the evidence in favor of the prosecution and examine the state court decisions through the deferential lens of 28 U.S.C. § 2254(d). *See Long*, 736 F.3d at 896 (explaining that a habeas court owes a "double dose" of deference when reviewing a state court ruling on sufficiency of the evidence); *Gonzales v. Gipson*, 701 F.Appx. 558, 559 (9th Cir. 2017) (same). Under this doubly deferential standard, to grant relief a court "must conclude that the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, *i.e.*, that each required element was proven beyond a reasonable doubt, was objectively unreasonable." *Boyer v. Belleque*, 659 F.3d 957 (9th Cir. 2011).

As discussed above, the evidence presented at trial, considered as a whole, readily allowed the trial court to find Petitioner guilty of Murder by Abuse beyond a reasonable doubt. As noted above, under Oregon law a person is guilty of Murder by Abuse if that person "recklessly under circumstances manifesting extreme indifference to the value of human life, causes the death of a child under 14 years of age . . . and . . . [t]he person has previously engaged in a pattern or practice of assault or torture of the victim." Or. Rev. Stat. § 163.115(1)(c)(A). Given the number and severity of RB's injuries, there was sufficient evidence for the trial judge to conclude that Petitioner engaged in behavior that he must have known carried a substantial and unjustified risk of death to RB. Further, given the delay before Petitioner sought medical attention for RB despite obvious signs that RB was in distress, there was sufficient evidence to conclude that Petitioner showed an extreme indifference to the value of human life. Accordingly, the state court's decision denying relief on

Petitioner's insufficiency of the evidence claim is entitled to deference, and Petitioner cannot obtain habeas corpus relief in this Court.

### III. Claims Alleged But Not Addressed in Petitioner's Brief

As noted, petitioner does not provide any legal argument on the remaining grounds for relief alleged in his Amended Petition for Writ of Habeas Corpus. As such, Petitioner has not sustained his burden to demonstrate why he is entitled to relief on these claims. *See Lampert v. Blodgett*, 393 F.3d 943, 970 n. 16 (9th Cir. 2004). Nevertheless, the Court has reviewed Petitioner's remaining claims and is satisfied that Petitioner is not entitled to habeas corpus relief.

## **RECOMMENDATION**

For these reasons, the Amended Petition for Writ of Habeas Corpus (ECF No. 19) should be DENIED, and a judgment of dismissal should be entered. A certificate of appealability should be denied as Petitioner has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2).

## **SCHEDULING ORDER**

The above Findings and Recommendation are referred to a United States District Court Judge for review. Objections, if any, are due by March 6, 2020. If no objections are filed, review of the Findings and Recommendation will go under advisement that date.

A party may respond to another party's objections within 14 days after the objections are filed. If objections are filed, review of the Findings and Recommendation will go under advisement upon receipt of the response, or on the latest date for filing a response.

DATED this 20th day of February, 2020.

John V. Acosta
United States Magistrate Judge