# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **ISAAC C. BYNUM**, | Case No. 6:15-cv-311-AC |
| Petitioner, | **ORDER** |
| v. | |
| **JEFF PREMO**, | |
| Respondent. | |

**Michael H. Simon, District Judge.**

United States Magistrate Judge John V. Acosta issued Findings and Recommendation in this case on February 20, 2020. ECF 58. Judge Acosta recommended that the Court reject Petitioner Isaac Bynum's habeas petition and decline to issue a certificate of appealability.

Under the Federal Magistrates Act ("Act"), the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). If a party files objections to a magistrate judge's findings and recommendations, "the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.*; Fed. R. Civ. P. 72(b)(3).

PAGE 1 – ORDER

For those portions of a magistrate judge's findings and recommendations to which neither party has objected, the Act does not prescribe any standard of review. *See Thomas v. Arn*, 474 U.S. 140, 152 (1985) ("There is no indication that Congress, in enacting [the Act], intended to require a district judge to review a magistrate's report to which no objections are filed."); *United States. v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) (holding that the court must review *de novo* magistrate judge's findings and recommendations if objection is made, "but not otherwise"). Although in the absence of objections no review is required, the Act "does not preclude further review by the district judge[] *sua sponte* . . . under a *de novo* or any other standard." *Thomas*, 474 U.S. at 154. Indeed, the Advisory Committee Notes to Fed. R. Civ. P. 72(b) recommend that "[w]hen no timely objection is filed," the Court review the magistrate judge's recommendations for "clear error on the face of the record."

Bynum timely filed an objection (ECF 65), to which Premo responded (ECF 70). Bynum contends that newly discovered scientific evidence offered in support of his habeas petition reveals that his conviction for murder by abuse of his two-year-old son R.B. turned on medical evidence about intentionally inflicted head trauma in children that, although accepted then, experts now understand to be flawed. Bynum objects to Judge Acosta's treatment of Bynum's new medical evidence of actual innocence, arguing that Judge Acosta both undervalued the new medical evidence and considered the new medical evidence under the wrong standard for actual innocence.

Bynum's objections focus on his newly discovered evidence. The merits of Bynum's amended petition, however, do not turn on that evidence. Bynum's newly discovered evidence is relevant only to the extent that it might excuse Bynum's procedural default on the claim on which he focuses: ineffective assistance of trial counsel. Bynum could have made a habeas claim

that his trial was fundamentally unfair because it was tainted with flawed scientific testimony. Indeed, Bynum appears to have raised this claim in the initial, now-inoperative petition he filed *pro se*. Whether Bynum's newly discovered evidence excuses his procedural default is a close question. The ineffective assistance of counsel claim Bynum seeks to revive, however, is without merit, as are Bynum's other claims. Accordingly, the Court adopts Judge Acosta's recommendation that the Court deny Bynum's petition with the following additional analysis.

Judge Acosta also recommended that the Court deny Bynum a certificate of appealability. The Court declines to adopt this recommendation. Bynum's initial, now-inoperative petition appears to raise a claim that his trial was fundamentally unfair because it was tainted by flawed medical testimony. Claims of this sort are cognizable in habeas, *Gimenez v. Ochoa*, 821 F.3d 1136, 1145 (9th Cir. 2016), and petitioners convicted of murder by abuse for intentionally inflicted head trauma have prevailed in habeas on this claim when a petitioner's convictions rested on medical testimony much like the testimony the State adduced at Bynum's trial, *see, e.g.*, *Hanson v. Baker*, 2018 WL 10400454 (D. Nev. March 13, 2018) *aff'd,* 766 F. App'x 501 (9th Cir. 2019). The Court cannot revive a claim that Bynum, aided by counsel, chose to abandon in his later habeas petition. The Court does, however, grant Bynum a certificate of appealability to argue that the Court should nevertheless consider his apparently abandoned claim of a fundamentally unfair trial and, if the Court can consider that claim, whether Bynum is entitled to relief on that claim.

## BACKGROUND

In a bench trial after Bynum waived his right to trial by jury, a state trial court convicted Bynum of murder by abuse of his two-year-old son, R.B., in violation of Oregon Revised Statute § 163.115(c)(A). The trial judge imposed a life sentence with a 25-year mandatory minimum term of incarceration. Bynum appealed the decision, but the Oregon Court of Appeals affirmed

without opinion, and the Oregon Supreme Court denied review. *State v. Bynum*, 222 Or.

App. 213, *rev. denied*, 345 Or. 460 (2008). The evidence at trial was as follows.

## A.  R.B.'s Injuries

At 10 a.m. on July 30, 2003, Bynum brought an unconscious but breathing R.B. to the

Oregon Health and Science University Hospital (OHSU) for treatment for a head injury.

Dr. Janice Ophoven, an expert witness for Bynum testified that R.B. arrived at the hospital

"basically braindead." ECF 17-1 at 176-77. Doctors determined that R.B. would die from his

injuries the same day and removed R.B.'s life support the next day with the consent of R.B.'s

mother, Chandra Sims.

Deputy State Medical Examiner Dr. Clifford Nelson performed the autopsy on R.B. and

testified at Bynum's trial. Dr. Nelson testified that head injuries were R.B.'s most significant

injuries and the cause of his death. Dr. Nelson described bruises on R.B.'s head, including deep

bruises on his left forehead and back left side of his head. R.B. also had a faint bruise on his right

forehead and an abrasion on the left side of his chin. The bruise on the back of R.B.'s head

corresponded to internal head injuries.

Dr. Nelson focused on a triad of internal head injuries. First, Dr. Nelson testified that

R.B. had a subdural hematoma; that is, ruptured blood vessels between the skull and brain.

Second, R.B. presented with cerebral edema, that is, R.B.'s brain had swelled, depriving parts of

R.B.'s brain of oxygen and pushing down on R.B.'s brain stem. Finally, R.B. also showed retinal

hemorrhaging; that is, fresh blood throughout the retina. Dr. Nelson testified that, while a

subdural hematoma was not, by itself, lethal or indicative of intentionally inflicted head trauma,

the subdural hematoma, combined with the retinal hemorrhage and cerebral edema could only

result from "a severe amount of force" such as "shaking, shake and slam," or "a child being

thrown violently across the room." ECF 17-1 at 44-48.

Dr. Nelson testified that R.B. had other injuries as well, including severe injuries to his chest area. R.B. had a bruise measuring two and three-fourths inches by two and three-fourths inches on his chest. Beneath the bruise were two recent rib fractures, a bruised left lung, a torn membrane covering the lungs, and a torn vein. The torn vein caused blood to accumulate in R.B. chest cavity. These injuries were so severe that Dr. Nelson opined that R.B. might have died from them had he not more rapidly died from the injuries to his head. Finally, Dr. Nelson testified that R.B. also had several whip marks in various stages of healing on his back, chest, and legs; three rib fractures two to four weeks old; and two more recent rib fractures.

## B. Bynum's Explanation of the Cause of R.B.'s Injuries

Bynum's explanations for the cause of R.B.'s injuries were inconsistent. At 10 p.m. on July 29, Bynum called Sims to tell her that he had hurt R.B. a couple of hours earlier. Bynum explained that he had been playing helicopter—which entails taking a child by one arm and one leg and swinging the child in circles—with R.B. and his other children but had tripped over his daughter and dropped R.B. R.B., Bynum told Sims, hit his head hard on either the couch or the table and had become groggy before falling asleep. Sims told Bynum to take R.B. to the hospital, but Bynum refused because he had his two other children with him. Bynum agreed, however, to call a doctor.

Sims called back a short time later. Bynum falsely told her that he had spoken with a doctor at the hospital who told him to bring R.B. in the next morning if R.B. did not feel better. Bynum again told Sims that he did not want to take R.B. to the hospital, but this time said it was because R.B. had marks on his legs from Bynum spanking him. Sims told Bynum to wake R.B. up every two hours to check on him. When Sims called back two hours later, no one answered the phone.

Around 8:30 a.m. the next morning, Bynum called his then-girlfriend Heather Johnson, who worked at OHSU. Bynum explained that he slipped while playing helicopter with the kids, causing him to drop R.B., who hit his head on the side of the couch and then the floor. Bynum told Johnson that R.B. was "dazed." Johnson told Bynum to bring R.B. to the hospital immediately.

At the hospital, OHSU social worker Laurie Burke spoke with Bynum about R.B.'s injuries. Burke testified that when she asked Bynum ask what caused R.B.'s injuries, Bynum told her that the injury occurred while Bynum was playing helicopter with R.B. and his other children. While swinging helicopter with R.B., Bynum had tripped on a coffee table, causing him to drop R.B. Bynum said R.B. hit his head on the floor as he was falling. Burke testified that when Bynum told her R.B. hit his head on the floor, Bynum's seven-year-old son interrupted to say that R.B. had first hit his head on the couch. Bynum told Burke that R.B. was alert after hitting his head and had drank some water before going to bed and that R.B. had responded to questions from Bynum earlier that morning. When Burke asked why Bynum waited to bring R.B. to the hospital, Bynum responded that he brought R.B. in right after his girlfriend told him to do so.

Karen Phifer, also an OHSU social worker, spoke to Bynum a few hours later. Phifer began to ask Bynum about R.B.'s medical history, but Bynum interrupted and told her that marks on R.B. were caused by "a little belt that [Bynum] used during potty training." ECF 16-1 at 119.

Beaverton Detective Daniel Kelly next spoke with Bynum. Bynum told Kelly that, while playing helicopter with R.B., Bynum fell backwards onto a loveseat and dropped R.B. R.B., Bynum told Kelly, hit his head on the floor. Bynum told Kelly that R.B. briefly cried and then "gave out a little gasp, like his last breath" and then "like went to sleep." Bynum told Kelly that

he later woke R.B. up to give him a class of water, but R.B. was unable to swallow the water. Bynum also told Kelly that R.B. was unable to sit up on his own. Bynum told Kelly that he called Sims, who concluded that R.B. probably had a "little bit of a concussion." Bynum told Kelly that he told Sims that he did not want to take R.B. to the hospital because he was afraid the hospital would report him to police after seeing marks on R.B. from whippings that Bynum gave R.B. with a belt. Bynum told Kelly that he changed his mind about taking R.B. to the hospital when R.B. was "still out of it" the next morning and his then-girlfriend encouraged him to bring R.B. to the hospital. Kelly asked Bynum about other injuries to R.B. Bynum explained that he had used a belt to whip R.B. during potty training but had only used the belt once.

Kelly then asked Bynum to demonstrate for Kelly how R.B. got injured in Bynum's apartment. In the apartment, Bynum showed Kelly that he tripped over the leg of a coffee table and then fell into a love seat. R.B., Bynum explained, fell to the floor face up. Bynum said that he was not sure whether R.B. hit his head on the couch before hitting the floor because Bynum was falling as well. Kelly again asked Bynum about the marks on R.B. and Bynum admitted that he had struck R.B. with a belt many times in the weeks before, including one incident where Bynum struck R.B. ten times.

Kelly then took Bynum to the Beaverton Police Department for questioning. While there, Bynum admitted to dropping R.B. twice. Bynum first dropped R.B. while flipping R.B. in the air, causing R.B. to fall vertically onto his head on a coffee table and then hit the floor. Bynum dropped R.B. a second time while playing helicopter. Kelly asked Bynum about R.B.'s broken ribs and Bynum replied that he may have broken R.B.'s ribs when he tried to perform CPR on him after the second time he dropped R.B. Bynum also said that he lightly shook R.B. after dropping him the second time because R.B. was limp.

PAGE 7 – ORDER

Bynum also testified at trial. Bynum explained that he first dropped R.B. while playing helicopter and that R.B. had probably fallen six or seven feet during that fall. R.B. hit his headfirst on the coffee table and then the floor. Bynum testified that when he picked R.B. up after that fall, R.B. blacked out. This startled Bynum, causing him to drop R.B. a second time. This time, R.B. fell onto the couch before hitting the floor. Bynum testified that after the second fall, R.B. did not appear to be breathing. Bynum administered CPR, and R.B. began breathing again. Bynum laid a groggy R.B. on the bed and called Sims. Bynum woke R.B. up when Sims instructed him to and gave R.B. some ice to eat. The next morning, however, Bynum could not wake R.B. up. He then called Johnson, who told him to bring R.B. in immediately.

Bynum testified that he was not angry at R.B. that evening, that he did not intentionally assault R.B., and that he did not shake R.B. Bynum explained that any inconsistencies between his testimony and Kelly's testimony resulted from Kelly not understanding his slang and accent or Bynum providing brief responses to Kelly's questions.

## C.  Medical Evidence at Trial

Multiple doctors testified for the prosecution. Dr. Nelson described the results of his autopsy. He concluded that only a "severe amount of force" could produce R.B.'s injuries. He specifically testified that he did not expect R.B.'s injuries to arise from a mere fall of ten feet.

Dr. Eileen Kirby, a pediatrician who treated R.B. at OHSU on July 30, testified that a fall from six feet could not have caused R.B.'s injuries. Dr. Kirby also testified that "no explanation I've been given explains this child's injuries." ECF 15-2 at 365. Dr. Kirby diagnosed R.B. with child abuse. Dr. Jeris Hedges, an emergency room physician, testified that with the size and severity of R.B.'s head injury, R.B. would have lost consciousness because of the injury and would have struggled to interact with others even after regaining consciousness.

Dr. Joseph Zenel testified that he diagnosed R.B. with Battered Child Syndrome and Shaken Infant Syndrome. Dr. Zenel based his diagnosis on R.B.'s brain injuries, bruises, and cuts, and older rib fractures. Dr. Zenel specifically testified that Bynum's explanation of R.B.'s injuries was not consistent with R.B.'s injuries. Dr. Zenel testified that only a "high energy impact" could have caused R.B.'s brain injuries—that is, the subdural hematoma, cerebral edema, and retinal hemorrhaging. ECF 16-1 as 252. Dr. Zenel analogized the force necessary to cause R.B.'s injuries to what would be expected from a child involved in a serious automobile accident where the child was not wearing a seatbelt. ECF 16-1 at 252.

Finally, Dr. Thomas Koch, the Director of Neurology at OHSU testified that, based on the severity of R.B.'s head injuries and the presence of bilateral retinal and pre-retinal hemorrhages, a six-to-seven-foot fall could not explain R.B.'s injuries. Dr. Koch believed that the injuries were "inflicted" or "non-accidental."

Bynum countered the prosecution's medical testimony with medical testimony from Dr. Janice Ophoven, a forensic pathologist with training and experience in pediatric forensic pathology. Dr. Ophoven testified that both child abuse and accidental trauma were possible causes of R.B.'s injuries. Dr. Ophoven believed that R.B.'s injuries reflected an accidental drop from a height of five or six feet. Dr. Ophoven also testified that R.B. suffered from rickets, which made him more susceptible to fractures. Dr. Ophoven also opined that an ordinary fall could have caused R.B.'s broken ribs. Finally, Dr. Ophoven testified that the tear in R.B.'s vein resulted from treatment at the hospital and that R.B. died from a stroke. Dr. Ophoven based that opinion on evidence that the pediatric neurologist who assessed R.B. suggested that there may have been a blockage of blood flow to the vein through R.B.'s internal carotid artery.

PAGE 9 – ORDER

Dr. Ophoven testified that the result of R.B.'s impact during fall could have caused the blockage, provoking a stroke.

Dr. Marvin Miller's testimony was similar to Dr. Ophoven. Dr. Miller testified that R.B. had rickets and possibly scurvy. Dr. Miller believed that the rickets weakened R.B. petrous bone, leaving the internal carotid artery under protected, increasing the chances that a fall damaged R.B.'s artery and created a blockage that provoked a stroke.

**D.  Other Testimony at Trial**

In addition to the medical testimony at trial, Bynum's trial also included testimony about Bynum's treatment of R.B. before the night of the incident. Michael Cook, one of Bynum's neighbors, testified that during a dinner with Bynum and R.B., he saw Bynum drag R.B. to the bathroom after R.B. resisted Bynum's order to go to the bathroom. After R.B. wet himself while being dragged, Cook said he heard what sounded like Bynum smacking R.B. and, a few minutes later, saw R.B. crying. Kimberly Manders, another dinner guest, however, testified that she heard no hitting or yelling.

Stacy Taylor, the maternal grandmother of Bynum's other two children, testified about her experience babysitting R.B. She said R.B. appeared afraid of and reluctant to go home with Bynum. When Taylor spoke with Bynum about his disciplinary methods, Bynum told her that he "want[ed] [his] kids to fear [him]." ECF 16-2 at 110. Bynum said the same to Laurie Sutfin, the great aunt of Bynum's other two children, when Sutfin challenged Bynum's disciplinary methods. Ted Williams and his fiancé Michelle Duncan also cared for R.B. Duncan testified that R.B. appeared to be in pain, especially in his ribs and chest area. Duncan also noticed an untreated wound on R.B.'s backside. On July 11, 2003, Dr. Teri Hero examined R.B. and found that R.B. had blisters on his lips from a viral infection and a rash on his chest and arms. Finally,

Bynum's former girlfriend and mother of his two other children testified that in the weeks before R.B.'s death, Bynum expressed to her his frustration that R.B. was not potty trained.

### E.  Procedural History

In 2014, Bynum petitioned for state post-conviction relief arguing only that his indictment failed to inform him of what acts or omissions constituted criminal conduct. The trial court denied relief. The Oregon Court of Appeals affirmed the trial court's denial without opinion, and the Oregon Supreme Court denied review. *Bynum v. Premo*, 261 Or. App. 584, *rev. denied*, 335 Or. 668 (2014).

In 2015, Bynum filed a *pro se* habeas petition raising four claims: (1) "Conviction obtained by use of tainted medical reports"; (2) "Denial of Due Process when State failed to prove intent to cause death"; (3) "Denial of Due Process when State failed to prove an act of criminal assault occurred [on] July 29, 2003"; and (4) "Fair trail denied when trial judge failed to question remaining medical reports being entered into trial court against [Bynum]." ECF 2 at 6-7. Judge Acosta appointed counsel to represent Bynum and later that year Bynum's counsel filed an amended habeas petition. That petition raised four claims, each different from the claims Bynum raised in his initial petition. In his brief in support of that petition, however, Bynum focuses only on two claims: (1) Bynum's trial counsel provided ineffective assistance in violation of the Sixth and Fourteenth Amendment by failing to thoroughly investigate and present helpful exculpatory evidence, especially as it relates to medical testimony about which of R.B.'s injuries are indicators of intentionally inflicted head trauma; and (2) Insufficient evidence supported Bynum's conviction. Bynum's amended petition does not include a claim that Bynum's trial was fundamentally unfair because it was tainted with flawed scientific evidence.

**DISCUSSION**

**A.  Ineffective Assistance of Counsel**

Bynum first argues that he is entitled to habeas relief because he was convicted at the end of a trial where he received ineffective assistance from counsel. Bynum admits that he defaulted his ineffective assistance of counsel claim but argues that, because he is actually innocent, the Court may consider his claim. As explained below, whether Bynum satisfies the gateway actual innocence standard the Supreme Court elucidated in *Schlup v. Delo*, 513 U.S. 298 (1995), is a close question. The Court, however, need not answer that difficult question because, even assuming Bynum has established satisfied the gateway actual innocence standard, he suffered no ineffective assistance of counsel.

    **1.  *Schlup* Actual Innocence**

        ***a.*  Standard of Review under *Schlup***

A court may consider otherwise-defaulted claims on the merits when the petitioner makes a claim of "actual innocence" under the "narrow class of cases . . . implicating a fundamental miscarriage of justice." *Schlup*, 513 U.S. at 315. As the Ninth Circuit explained,

> The terminology in this area is sometimes confusing, because the "miscarriage of justice" exception, like the freestanding claim in *Herrera* [*v. Collins*, 506 U.S. 390 (1993)], has been described as a showing of "actual innocence." But unlike a *Herrera* claim, the "miscarriage of justice" exception is not an independent avenue to relief. Rather, if established, it functions as a "gateway," permitting a habeas petitioner to have considered on the merits claims of constitutional error that would otherwise be procedurally barred.

*Carriger v. Stewart*, 132 F.3d 463, 477 (9th Cir. 1997). The threshold for invoking the "'miscarriage of justice' exception is lower than the 'extraordinarily high' threshold for freestanding (*Herrera*) claims of innocence." *Id.*

"To make a successful claim under *Schlup*, 'a petitioner must show that in light of all the evidence, including new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Cooper v. Woodford*, 358 F.3d 1117, 1119 (9th Cir. 2004) (quoting *Carriger*, 132 F.3d at 478). The court must make this "determination concerning the petitioner's innocence in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." *Schlup*, 513 U.S. at 328 (quotation marks omitted). "In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial." *Id.* at 327. The Court "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial," and "may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Id.* at 332. The required showing is procedural, not substantive, and the petitioner must "present 'evidence of innocence' such that 'a court cannot have confidence in the outcome of the trial.'" *Carriger*, 132 F.3d at 478 (quoting *Schlup*, 513 U.S. at 316).

### b.  Bynum's New Evidence

Bynum's new evidence is a report from Dr. Jill Cobb attached to his memorandum in support of his amended habeas petition. The report explains that, although testimony at Bynum's trial about intentionally inflicted head trauma was representative of contemporary medical understanding, current medical knowledge no longer supports that testimony. Dr. Cobb contends that the assertion "[t]hat the triad of [subdural] hematoma, retinal hemorrhages, and cerebral edema is indicative without a doubt of non-accidental trauma has not passed the scientific method base of research." Dr. Cobb declares that studies and individual cases reveal "that babies and infants have sustained this triad of injuries from falls under four feet." *Id.* at 12. Dr. Cobb

concludes that "[a]n impact causing fatal or near fatal injury cannot be determined to be intentional or non-intentional due to the physical findings." *Id.*

Dr. Cobb then applies her understanding of the current medical consensus surrounding intentionally inflicted head trauma to the circumstances of R.B.'s death. Dr. Cobb reviewed R.B.'s autopsy and hospital records, police records relating to the investigation of R.B.'s death, transcripts of Bynum's trial, and interviews with Bynum and others close to him. Dr. Cobb acknowledges the presence of subdural hematoma, retinal hemorrhages, and cerebral edema in R.B. and concludes that "[R.B.] died of blunt impact injuries to the head." Dr. Cobb's report differs from the testimony of the doctors who the prosecution had testify at Bynum's trial in what conclusions she draws from presence of subdural hematoma, retinal hemorrhages, and cerebral edema in R.B. At trial, doctors testified that the existence of those three conditions was proof of intentionally inflicted head trauma. Dr. Cobb opines, however, that current medical knowledge does not permit that inference. Instead, Dr. Cobb explains, R.B.'s injuries "could have occurred from being released from the grip of the person swinging him and impacting a table, sofa, and the floor," as Bynum contends occurs. ECF 41-1 at 13.

Dr. Cobb also opines that "[R.B.] had received abusive whipping injuries to his legs, back[,] and buttocks" but "none of these whipping injuries were involved in [R.B.'s] death." *Id.* at 13. Dr. Cobb acknowledges that "[R.B.] also had old fractures of an unknown source and time interval" but adds that she "[does] not know with any degree of medical certainty that [Bynum] caused these injuries and whether [R.B.'s] underlying disease of rickets played a part in the injuries." *Id.* Finally, Dr. Cobb noted a "[l]aceration of the inferior vena cava" causing 30 mL of blood to fill R.B.'s chest cavity, *id.* at 5, but does not offer an opinion on the cause of that injury.

### c.  Analysis

Courts have addressed the effect of new evidence reflecting an updated scientific consensus on the inferences that safely can be drawn about intent when a victim presents with the triad of subdural hematoma, retinal hemorrhages, and cerebral edema. The United States District Court for the District of Nevada most recently addressed the changing scientific consensus surrounding intentionally inflicted head trauma in children. *Hanson v. Baker*, 2018 WL 10400454 (D. Nev. March 13, 2018). Hanson was convicted of first-degree murder for killing by child abuse his twenty-month-old stepdaughter, Tamara. *Id.* at *1. An autopsy revealed that Tamara suffered, among other injuries, a triad of injuries resulting from trauma to the head: subdural hemorrhage, cerebral edema, and retinal hemorrhage. *Id.* at 4. Hanson asserted that these injuries resulted from an accidental three-foot fall on the steps of the family home. *Id.* During his trial, however, the State elicited testimony from multiple doctors that a short fall could not cause the triad of injuries. *Id.*; *see also id.* at *8 (quoting the testimony of Dr. Tim Kutz as "all [studies] would say . . . that falls under three feet, under four feet, under ten feet, do not result in significant brain injury"). Instead, doctors testified that the triad of injuries were a near certain indicator of intentional abuse, like violent shaking. *Id.* at *6-10; *see, e.g.*, *id.* at *9 (quoting the testimony of Dr. Kutz as "when you are seeing all three, massive retinal hemorrhaging, subdural hemorrhage, significant brain swelling, that is classic for violent shaking"). The State reinforced this testimony with its statements during the opening and closing of trial. *Id.* at *4-5, *12-14.

At an evidentiary hearing for his habeas petition, Hanson produced testimony from Dr. Janice Ophoven, Dr. Kenneth Monson, and Dr. Sandra Cetl. Dr. Monson testified that more recent studies of child head trauma revealed that unprotected short falls can produce the amount of force necessary to cause the triad of injuries Tamara suffered. *Id.* at 15. Dr. Monson also

testified that studies show that shaking a child, without impact, would not generate enough force to cause Tamara's injuries. *Id.* Dr. Ophoven testified that, although at the time of trial medical experts widely accepted the triad theory of intentionally inflicted head trauma, the current scientific consensus no longer supported that theory. *Id.* at *16-17. Dr. Ophoven also testified that Tamara could present with the triad of subdural hematoma, retinal hemorrhages, and cerebral edema after a short fall as Hanson described at trial. *Id.* at *19. Consistent with Dr. Monson's and Dr. Ophoven's testimony, Dr. Cetl testified that although the triad theory represented the scientific consensus at the time of Hanson's trial, medical experts have since rejected the theory. *Id.* at *20.

Based on the testimony of Dr. Monson, Dr. Ophoven, and Dr. Cetl, the court found that "the scientific consensus regarding the shaken [infant] syndrome, and regarding what injuries can be caused to children by small falls, has changed significantly." *Id.* at *14. Because the State made its case against Hanson "primarily by presenting scientific evidence purporting to establish that, taken together, three of Tamara's injuries—subdural hemorrhage, cerebral edema[,] and retinal hemorrhage—were a distinct and certain indication that she had been shaken or otherwise abuse," *id.* at *4, Hanson's new evidence persuaded the court that it was "more likely than not that no reasonable juror would have convicted Hanson in light of the new evidence," *id.* at *21.

Because Hanson satisfied the *Schlup* standard, the court considered his otherwise defaulted habeas claim that "the admission of flawed expert testimony at trial undermined the fundamental fairness of the entire trial," in violation of the Fourteenth Amendment's due process clause. *Id.* at *23. The court relied on the Ninth Circuit's decision in *Gimenez v. Ochoa*, 821 F.3d 1136 (9th Cir. 2016). In *Gimenez*, the Ninth Circuit considered whether new evidence refuting the triad-theory could satisfy the even more demanding standard for granting relief on a

claim made for the first time in a successive habeas petition.[1] 821 F.3d at 1143-44. The panel affirmed the district court's denial of the petitioner's habeas claim both because Gimenez's new evidence revealed "not so much a repudiation" of the triad theory, but merely a "vigorous debate about its validity" and because other evidence, including petitioner's own inconsistent statements, admitted past violent behavior, and other injuries to the victim, rendered Gimenez's new evidence unable to satisfy the clear and convincing standard. *Id.* at 1145. The panel nevertheless explained that "claims of constitutional error grounded in faulty science" were permitted "in a second or successive petition." *Id.* at 1145.

The *Hanson* court found that the "flawed scientific evidence regarding the triad-only shaken baby diagnosis . . . rendered [Hanson's] trial fundamentally unfair and violated fundamental conceptions of justice." *Id.* at *26. The court distinguished *Gimenez*, noting that the petitioner in *Gimenez* needed to satisfy a higher evidentiary standard, had presented weaker evidence about the scientific community's rejection of the triad theory, and was convicted on evidence beyond just the triad theory. *Hanson*, 2018 WL 10400454, at *25. The court rejected Hanson's claims for insufficient evidence, *id.* at *27, and ineffective assistance of counsel, *id.* at *28, 33. The Ninth Circuit affirmed the district court's decision. *Hanson v. Baker*, 766 F. App'x 501, 504 (9th Cir. 2019). The panel noted, however, that "[o]n appeal, the State does not contest the district court's finding that [the petitioner] has satisfied the gateway 'actual innocence' standard under *Schlup*." *Id.* at 502.

---

[1] The *Schlup* standard requires only that a court find that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence. 513 U.S. at 329. To prevail on a claim raised for the first time in a successive habeas petitioner, however, the new evidence must be "sufficient to establish by *clear and convincing evidence* that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii) (emphasis added).

Bynum's case lies between *Gimenez* and *Hanson*. The degree to which the State relied on the triad theory in Bynum's trial more closely resembles that of prosecutors in *Gimenez* than *Hanson*. The triad of injuries was not the only medical evidence of R.B.'s intentional head trauma. For example, Dr. Nelson highlighted bruises that both corresponded to R.B.'s internal head injuries—*i.e.,* bruises on the back, left side of R.B.'s head—and bruises that did not correspond to internal injuries—*i.e.,* bruises R.B.'s right forehead and the left side of his jaw and chin. ECF 17-1 at 28-29. Moreover, as in *Gimenez*, there is evidence of other injuries to R.B., including a bruised lung and torn vena cava. Dr. Nelson testified that the torn vena cava was potentially lethal. Dr. Cobb's report offers no opinion on what caused the tear in R.B.'s vena cava.

Plenty about Bynum's trial, however, resembles the constitutionally deficient trial in *Hanson*. Unlike in *Gimenez*, in both *Hanson* and Bynum's trial, prosecutors relied on medical expert testimony about the triad theory not only as evidence of intentionally inflicted head trauma, but also to negate the defendant's testimony that the victim's injuries arose from a short fall. *See Hanson v. Baker*, 2018 WL 10400454, at *8 (quoting the testimony of Dr. Tim Kutz as "all [studies] would say . . . that falls under three feet, under four feet, under ten feet, do not result in significant brain injury"). In Bynum's trial, for example, when asked if a short fall or collision with the wall from a short distance as Bynum described could cause R.B.'s injuries, Dr. Zenel answered "[n]o." ECF 16-1 at 245-46. Indeed, when asked what could have caused "retinal hemorrhaging, the subdural hematoma, and the great amount of swelling on the left side of the brain [cerebral edema] other than shaking," Dr. Zenel identified only intentionally inflicted head trauma, strangulation, and automobile accidents. *Id.* at 251-52.

The most important similarity between *Hanson* and Bynum's case, and what most distinguishes Bynum's petition from that at issue in *Gimenez*, is the standard to be applied. Because Bynum is seeking to revive an otherwise defaulted claim rather than prevail on a claim raised for the first time on a successive habeas petition, Bynum, like *Hanson*, need only demonstrate that it is more likely than not that "no reasonable juror would convict [Bynum] in light of the new evidence." *Id.* at *21 (citing *Schlup*, 513 U.S. at 329).[2] In *Gimenez*, meanwhile, the petitioner's claim failed partly because petitioner's evidence did not rise to the more demanding clear-and-convincing-evidence standard. 821 F.3d at 1145. Perhaps the petitioner's claim in *Gimenez* would have prevailed under the more forgiving standard applicable to Bynum. Moreover, as explained above, Bynum's claim is stronger than was the petitioner's claim in *Gimenez*. Accordingly, the Court is reluctant to find that Bynum has failed to meet the gateway actual innocence standard.

The close relationship between the *Schlup* standard and the determination of the merits of a petitioner's claim that his trial was fundamentally unfair because it was infected by flawed scientific evidence furthers the Court's reticence. In *Hanson*, the court's analysis of the merits of

---

[2] Bynum argues that Judge Acosta evaluated Bynum's new medical evidence of actual innocence using a clear and convincing evidence standard, instead of the preponderance standard. Judge Acosta explained, however, that to claim the gateway actual innocence exception, Bynum needed to "prove that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." ECF 58 at 23 (citing *Schlup*, 513 U.S. at 327).

Bynum contends that, whatever standard Judge Acosta described, Judge Acosta *applied* the clear and convincing standard by relying on *Gimenez*. Judge Acosta did cite *Gimenez*, but not for the proposition that Bynum had to establish by clear and convincing evidence that no reasonable juror would have found Bynum guilty. Indeed, in the same citation, Judge Acosta cited a case applying the correct preponderance standard. *See id.* (citing *Foster v. Oregon*, 2012 WL 3763543 (D. Or. Aug. 29, 2012)). Judge Acosta applied the correct standard. The Court adopts those portions of Judge Acosta's Findings and Recommendations.

petitioner's claim relied on the court's earlier determination that, to satisfy the gateway actual innocence standard, the petitioner had produced newly discovered evidence that his trial was tainted by flawed scientific evidence. *See Hanson*, 2018 WL 10400454, at *24 (relying on analysis that was "discussed above" in the opinion to conclude that "Hanson has made a showing warranting relief" because "Hanson has shown that his trial was tainted, from beginning to end, by the State's use of scientific evidence that the prosecution presented as indicative of his guilt, but that has now been debunked"). Thus, passing on this close question bears not only on a procedural issue with Bynum's petition, but also on whether Bynum's trial was constitutionally deficient in a way that Bynum does not argue it was, at least not in his amended petition.

As explained below, however, the Court need not resolve this question because the claim Bynum hopes to revive through the gateway actual innocence standard—that Bynum suffered ineffective assistance of counsel at trial—is meritless.

### 2. Ineffective Assistance of Counsel

Even assuming, though not deciding, that Bynum satisfied the gateway-actual innocence standard, the ineffective assistance of counsel claim that he seeks to revive fails. To show ineffective assistance, a petitioner must show both (1) that counsel's performance was deficient and (2) that counsel's deficient performance prejudiced the petitioner; *i.e.,* there is a reasonable probability that, but for the deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-88. Counsel's performance is constitutionally deficient only where it falls below an objective standard of reasonableness. *Id.* A "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). "The challenger's burden is to show 'that counsel made

errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 687). As for investigations, *Strickland* provides that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691.

Bynum argues that his trial attorney was deficient for failing to counter the State's allegedly flawed expert testimony about R.B.'s injuries testimony being the result of non-accidental trauma. Bynum's counsel did, however, counter this testimony. One of Bynum's expert medical witnesses at trial, Dr. Janice Ophoven, is the same expert witness upon whom the *Hanson* court relied to conclude there had been a sea change in the scientific consensus surrounding the triad theory. *See Hanson*, 2018 WL 10400454, at *15. The Court cannot conclude that Bynum's counsel erred so grievously as to not function as counsel, *see Harrington*, 562 U.S. at 104, when his efforts to counter the allegedly flawed medical testimony included adducing testimony from an expert witness whose testimony later courts have relied on to vacate convictions based on medical evidence similar to what Bynum argues his counsel should have countered.

The content of Dr. Ophoven's testimony at Bynum's trial reaffirms that Bynum's counsel was not deficient in countering the allegedly flawed medical testimony. The opinions to which Dr. Ophoven testified at trial resemble the opinions Dr. Cobb expresses in her letter to the habeas court. Dr. Cobb endorses the view that, although the triad of subdural hematomas, retinal hemorrhages, and cerebral edema may represent some evidence of abusive head trauma, the presence of the triad of injuries cannot alone diagnose abusive head trauma because while the presence of the triad of injuries is evidence of "shearing forces . . . severe enough to cause

death," "the motivation behind those forces cannot be determined by autopsy examination alone." *See* ECF 41-1 at 13. Dr. Ophoven similarly testified that she could not determine from R.B.'s injuries alone whether those injuries were intentionally inflicted. Consider Dr. Ophoven's testimony about retinal hemorrhaging: "I think [R.B.] had traumatic injury. . . . [Retinal hemorrhaging is] consistent with the consequences of trauma. What I'm saying is *you can't say whether the trauma was inflicted or accidental* by looking in the eyes." ECF 17-1 at 226 (emphasis added). Similarly, when asked whether a rotational brain injury as evidenced by the presence of the triad of injuries better supported the diagnosis of Battered Child Syndrome than did Dr. Ophoven's theory that R.B. suffered a stroke, Dr. Ophoven replied that "either [stroke or rotational brain injury] *could have occurred with either accident or inflicted injury*." *Id.* at 190 (emphasis added). Thus, Dr. Ophoven pointed to the same flaws in the state's medical testimony as does Dr. Cobb.

Bynum is correct that, unlike Dr. Cobb, Dr. Ophoven did not testify at Bynum's trial that the scientific consensus no longer supported the triad theory of intentional head trauma. Given the evolving nature of the scientific consensus surrounding intentional head trauma in children, however, that makes sense. As Dr. Cobb explains, even today "[t]here *continues* to be a great deal of debate in the medical community over head injuries in children . . . . At this point in time, evidence *is growing* that there isn't." ECF 41-1 at 12 (emphasis added). At best, the shift in the scientific consensus was nascent at the time of Bynum's trial. A 2001 position paper from the National Association of Medical Examiners reveals the equivocal nature of the scientific consensus surrounding intentional head trauma in children at the time of Bynum's trial. The position paper cautions that when diagnosing intentional head trauma in children, "each case must be evaluated thoroughly with scene investigation, laboratory tests, medical examination,

and understanding the actual biomechanical forces behind trauma." *Id.* That same position paper,

however, also states that "'subdural hematomas, retinal hemorrhages[,] and cerebral edema are

markers of' intentional head trauma in children." *Id*. At the time of Bynum's trial, neither

Dr. Ophoven nor any other witness could have testified to a shift in the scientific consensus

because that shift had yet to occur.

During trial, Dr. Ophoven testified to many of the same alleged flaws in the state's

medical testimony that Dr. Cobb's letter highlights now. Bynum's trial counsel countered the

State's allegedly flawed medical evidence as best as could be expected given the then-nascent

debate about the veracity of the triad theory of intentionally inflicted head trauma. That is

enough to defeat Bynum's claim of ineffective assistance of counsel. The Court adopts Judge

Acosta's recommendation that the Court reject Bynum's ineffective assistance of counsel claim.

## B.  Insufficient Evidence

Bynum's petition also claims that he was convicted in violation of the Fourteenth

Amendment's Due Process Clause because the conviction was not supported by sufficient

evidence. It is unclear from Bynum's objections whether he objects to Judge Acosta's

recommendation that the Court reject Bynum's insufficient evidence claim. Indeed, even

Bynum's petition fails to specify how the evidence at Bynum's trial is insufficient to support his

conviction. The Court adopts Judge Acosta's recommendation.

When reviewing a habeas corpus claim based on insufficient evidence, "[t]he relevant

question is whether, after viewing the evidence in the light most favorable to the prosecution,

any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). When the record supports

conflicting inferences, courts must presume the trier of fact resolved the conflicts in favor of the

prosecution. *Id.* at 326. Because this issue occurs in the habeas corpus context, which carries

with it a stringent standard of review, this court must apply a "double dose of deference" to the state court decision, a level of deference "that can rarely be surmounted." *Boyer v. Belleque*, 659 F.3d 957, 964 (9th Cir. 2011).

The *Jackson* insufficient evidence standard is more stringent than *Schlup*'s gateway actual innocence standard. *See House*, 547 U.S. at 538 ("[T]he gateway actual-innocence standard is 'by no means equivalent to the standard of *Jackson v. Virginia*, 443 U.S. 307 (1979).'"). A court applying the *Schlup* standard must determine what a reasonable jury would have found if presented with the petitioner's new evidence. *Id.* at 538-39. When conducting this analysis, a court may reassess the credibility of trial witnesses in light of the new evidence. *Id.* at 538-39. When applying *Jackson*, however, a court must "presume the [trier of fact] resolved evidentiary disputes reasonably so long as sufficient evidence supports the verdict." *Id.* at 538; *see also Jackson*, 443 U.S. at 330. Indeed, the *Hanson* court found that the new evidence "is not taken into account with respect to [a *Jackson*] claim." 2018 WL 10400454, at *27.

To convict Bynum of murder by abuse, the State had to prove that Bynum "recklessly under circumstances manifesting extreme indifference to the value of human life, cause[d] the death of a child under 14 years of age" and had "previously engaged in a pattern or practice of assault or torture of the victim." Or. Rev. Stat. § 163.115(c)(A). The State proved each element.

The core issue of Bynum's trial was whether Bynum intentionally inflicted the injuries that killed R.B. Bynum testified that the injuries resulted from an accident while playing with R.B. The trier of fact did not believe Bynum's testimony. Plenty of evidence supports the trier of fact's conclusion. Most importantly, multiple medical professionals testified that the accident Bynum described could not produce R.B.'s injuries. Bynum has presented some evidence that this testimony was flawed and no longer enjoys the support of the scientific community, but for

purposes of a *Jackson* insufficient evidence challenge, the Court cannot consider Bynum's new evidence. *Hanson*, 2018 WL 10400454, at *27; *see also House*, 547 U.S. at 538 ("[T]he gateway actual-innocence standard is 'by no means equivalent to the standard of *Jackson v. Virginia*, 443 U.S. 307 (1979).'"). Other evidence supports the trier of fact's findings. R.B. had other lethal injuries not explained by Bynum's account of the incident, including broken ribs, a bruised lung, and torn vena cava. Additionally, Bynum's account of the incident often changed, undermining his credibility.

Sufficient evidence also supports the trier of fact's findings about the other elements of the offense. Medical experts testified that only intentionally inflicted abuse could produce R.B.'s injuries. Intentionally inflicted abuse causing lethal injuries would manifest indifference to human life. Moreover, Bynum waited twelve hours to get R.B. despite acknowledging immediate signs that R.B. was in distress. Finally, the trier of fact heard testimony about rib fractures and whipping marks three or more weeks old. Those who knew Bynum testified that he whipped R.B. and used other forms of physical discipline to instill in R.B. a fear of Bynum. This testimony is enough to find that Bynum "engaged in a pattern or practice of assault . . . of the victim." Or. Rev. Stat. § 163.115(c)(A) Because sufficient evidence supports Bynum's conviction, the Court adopts Judge Acosta's recommendation that the Court reject Bynum's habeas claim that insufficient evidence supported his conviction.

## C.  Certificate of Appealability

Judge Acosta recommends that the Court deny Bynum a certificate of appealability. The Court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The certificate of appealability must "indicate" the "specific issue or issues" for which the applicant has made a substantial showing of the denial of a constitutional right. *Id.*

In his objections to Judge Acosta's Findings and Recommendations, Bynum argues that he "is entitled to habeas corpus relief based on the significant, newly discovered evidence that proves his actual innocence." ECF 65 at 12. Bynum's amended petition, however, makes no claim the merits of which turn on his newly discovered evidence. Instead, as discussed above, Bynum relies on his newly discovered evidence only to resurrect otherwise defaulted claims.

Bynum's initial, *pro se* petition, which is now inoperative arguably did make such a claim. Bynum's initial petition included a claim that Bynum was entitled to habeas relief because his conviction was "obtained by use of tainted medical reports." ECF 2 at 6. Further describing this claim in the initial petition, Bynum states that the medical evidence did not support Dr. Nelson's testimony about what caused R.B.'s injuries. As explained above, claims that flawed scientific evidence tainted a petitioner's trial, rendering the trial fundamentally unfair are cognizable in habeas. *Gimenez v. Ochoa*, 821 F.3d at 1145.

Indeed, as *Hanson* shows, petitioners convicted of murder by abuse for intentionally inflicted head trauma have prevailed in habeas on this claim where the petitioner's convictions rested on medical testimony much like testimony the State adduced at Bynum's trial. *See generally Hanson v. Baker*, 2018 WL 10400454 (D. Nev. March 13, 2018) *aff'd,* 766 F. App'x 501 (9th Cir. 2019). As the Court explained above, whether Bynum has satisfied the gateway actual innocence standard—a close question—bears heavily on the merits of a claim that this trial was tainted by flawed medical evidence. Thus, this claim from Bynum's now-inoperative initial petition would, if properly before the Court, represent a substantial showing of a denial of a constitutional right.

The Court need not consider whether Bynum could prevail on this claim from his initial, *pro se* petition, however, because Bynum appears to have abandoned the claim in his amended

petition filed by court-appointed counsel. The Court cannot rule on the merits of unraised or abandoned claims. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("[A]s a general rule, our system 'is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in judgment))). Because, however, Bynum raised a potentially meritorious claim in his self-filed petition, the Court grants Bynum a certificate of appealability to argue that the Court should nevertheless consider his apparently abandoned fundamentally unfair trial claim and, if the Court can consider that claim, whether Bynum is entitled to relief on that claim.

## CONCLUSION

The Court adopts Judge Acosta's Findings and Recommendation (ECF 58) in part. The Court **DENIES** Bynum's habeas petition (ECF 19). The Court **GRANTS** Bynum a certificate of appealability to argue that the Court should nevertheless consider his apparently abandoned fundamentally unfair trial claim and, if the Court can consider that claim, whether Bynum is entitled to relief on that claim.

**IT IS SO ORDERED.**

DATED this 6th day of April, 2021.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge